## LIPSCOMB *v.* STATE

[No. 97, September Term, 1960.]

*Decided December 13, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Robert B. Watts,* with whom were *Benjamin L. Brown* and *Brown, Allen & Watts* on the brief, for the appellant.

*Robert C. Murphy, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Saul A. Harris, State's Attorney for Baltimore City, Joseph G. Koutz, Deputy State's Attorney,* and *Charles E. Moylan, Jr., Assistant State's Attorney,* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

Nathaniel Lipscomb, the appellant, was arrested in Baltimore City on April 18, 1959, and was subsequently indicted for the rape and murder of Lottie Kight (indictments Nos. 1603 and 1600 respectively), the rape and murder of Pearl Weiss (indictments Nos. 1602 and 1599 respectively) and the rape and murder of Mae Hall (indictments Nos. 1601 and 1598 respectively). He was arraigned on May 12, 1959, at which time he pleaded not guilty to each of the charges. On the day following his arraignment Lipscomb added pleas in each case of not guilty by reason of insanity, one (the second plea) on the ground that he was insane at the time of the alleged commission of the offenses charged and the other (the third plea) on the ground that he was "insane now," to his original plea of not guilty. Thereafter, in accordance with an order of the Criminal Court of Baltimore, appellant was sent to the Patuxent Institution for electroencephalographic studies, and on December 14, 1959, an order was issued by that court directing his examination by the Psychiatric Staff of the Maximum Security Hospital at Jessups, Maryland.

Three separate trials were subsequently held before Judges Cullen and Carter sitting without a jury, each of which included the indictments for the rape and murder of one of the women. At each of these trials appellant stood on his pleas of not guilty, and of not guilty by reason of insanity at the time of the alleged offense, but abandoned his third plea of not guilty by reason of insanity at the time of trial. In each of the cases appellant was found guilty, as charged, of the rape and first degree murder of one of the women and on February 26, 1960, he was sentenced to death for the first degree murder of Lottie Kight. Sentence on each of the other five convictions was suspended pending execution of the sentence imposed for the first degree murder of Lottie Kight. All are appealable. See Code (1957), Art. 5, Sec. 13.

The appellant first claims that the trial court erred in finding him to have been sane at the time of the commission of each of the crimes for which he was convicted. He contends that sufficient evidence of insanity on his part was introduced to shift the burden to the State to prove him to have been sane

at the time these offenses were committed, that the State failed to prove that he was sane at these times, and hence that the trial court was in error in finding him sane at such times. Second, the appellant claims that the evidence of rape and murder in each of the cases was insufficient to warrant the trial court's finding him guilty of those offenses.

We shall first review the evidence bearing on the question of the appellant's alleged insanity. Lipscomb was examined by Dr. Morganstern, of the State Department of Psychiatry, who is the Superintendent of the Maximum Security Hospital at Jessups. Dr. Morganstern had before him a copy of a statement made to the police by Lipscomb with regard to the Pearl Weiss case. He also had a copy of a report concerning Lipscomb made by Dr. Guttmacher, the Medical Director of the Supreme Bench of Baltimore City and a very well known psychiatrist, and a copy of the report of Dr. Ainsworth, a psychologist for the Supreme Bench.[1] Dr. Morganstern was assisted by Dr. Oropollo, a psychologist who works with him frequently. He (Dr. Morganstern) obtained information showing that a mental hospital where Lipscomb had been a patient some years before had found him to be a defective with an I.Q. of 51. Dr. Morganstern and Dr. Oropollo rated him somewhat higher as a result of their tests, finding that his I.Q. performance was 57 and his full scale I.Q. was 57. They classified him as a "moderate defective" from the point of view of intelligence.

Dr. Morganstern was the only psychiatrist who testified in the case. He testified at length with regard to his examination of Lipscomb, which was made in December, 1959. In short, he found Lipscomb sane at the time of the examination within the rule adopted by this Court in *Spencer v. State,* 69 Md. 28, 37, 13 A. 809,[2] but he could not determine whether

---

1. Their reports are not included in the appendix. It appears from a statement of the court at the time of imposing sentence that Dr. Guttmacher found Lipscomb not to be of a high intellectual group, but also found him to be "responsible for his crimes."

2. The *Spencer* case has been followed in many cases, among the more recent of which are *Watts v. State,* 223 Md. 268, 164 A. 2d 334, 335, and *Stansbury v. State,* 218 Md. 255, 262, 146 A. 2d 17.

or not the defendant was insane eight months or a year prior to the time of his examination, which were the dates when the offenses here charged had been committed.

There was some testimony by Lipscomb to the effect that a number of years previously he had been charged with the murder of a woman in Charlotte, North Carolina, that he was not guilty of the charge, but that he had confessed to it, that he was sent (at the instance of his sister) to a mental hospital in Goldsboro, North Carolina, where he had stayed about six months, and that he had then been released and was never tried for that offense. Some information regarding this matter (including the report of his I.Q. test above mentioned) was before Dr. Morganstern at the time of his examination. Lipscomb's testimony about his stay and examination at Goldsboro was very vague, apparently because it had been so long ago that he had forgotten the details relating to it. How long ago it actually was does not appear, but Lipscomb's testimony indicates that he had been living in Baltimore for six years and that it had been prior to his coming there. So far as the record before us shows, this hospital reported that Lipscomb was of low intellectual capacity, but there is nothing to show any report of insanity. The fact that he was released implies that he was not regarded as insane.

Dr. Morganstern considered it possible that at some time in the future Lipscomb might "break with reality and go into an actual psychotic condition," but his testimony indicates that he was speaking only of a future possibility, not of something which had previously happened. He also noted the possibility that the use of alcohol might lower Lipscomb's inhibitory forces, and he found the thing which bothered him most about Lipscomb was the defendant's apparent indifference to the seriousness of his predicament. That, however, would seem to relate to his present, rather than his past, mental condition; and Dr. Morganstern definitely considered Lipscomb sane at the time when he displayed this indifference.

Lipscomb claimed to have been under the influence of alcohol at the time of each of the acts of sexual intercourse, which he admitted in statements to the police, and which are further referred to below. However, even if he was drunk on these

604

occasions, it is the general rule that voluntary drunkenness does not relieve an individual of responsibility for his crimes. *Breeding v. State,* 220 Md. 193, 151 A. 2d 743; *Stansbury v. State, supra; Saldiveri v. State,* 217 Md. 412, 424, 425, 143 A. 2d 70; *Chisley v. State,* 202 Md. 87, 107, 95 A. 2d 577.

In this State a man is presumed sane until sufficient proof of his insanity is introduced to raise a question in the minds of reasonable men as to whether he is or is not sane. If sufficient proof of the defendant's insanity is introduced to raise such a question, the presumption of sanity is said to be overcome and a further question then arises, on which there is a division of authority, as to whether the defendant must go forward and prove his insanity by a preponderance of the evidence, or whether the State must then offer proof to establish the defendant's sanity beyond a reasonable doubt. Here we think that the evidence is insufficient to raise the requisite threshhold question as to the defendant's sanity at the times of the commission of the several crimes of which he was convicted. In brief, there was the hospitalization at a mental hospital some years before without any report of any finding of insanity even then, there was expert psychiatric testimony as to his sanity eight to twelve months after the offenses, and there was no testimony to establish insanity at the time of the commission of these crimes. The presumption of sanity therefore continues operative and is not overcome. Accordingly, the problem of determining which party must bear the burden of proof on the insanity issue is not reached, and the State is not obligated under either rule to prove the sanity of the defendant. *Saldiveri v. State, supra,* 217 Md. 412, 423, 424, 143 A. 2d 70; *Thomas v. State,* 206 Md. 575, 587-588, 112 A. 2d 913.

The second question which appellant raises concerns the sufficiency of the evidence upon which he was found guilty of the three rapes and murders. After careful consideration of the record in each of the cases this Court cannot find that the trial court erred in finding that each of the three women had been raped and murdered by the appellant, and that he was guilty of murder in the first degree in each case.

The crimes were generally similar and all were committed

within a small geographical area near where the defendant lived. In each case the testimony and report of the Medical Examiner showed that death was caused by manual strangulation and that spermatozoa had been found in the victim's vagina. Clear medical evidence of violence was found in two of the cases (Lottie Kight and Pearl Weiss); in the third, there was other evidence from which lack of consent to sexual intercourse on the part of the victim was readily inferable. In that case (Mae Hall) the body was found early on a December morning on the concrete pavement of a back yard or alley, where the crimes had occurred. Each of the other victims was also killed in a back yard or alley. The testimony showed that Lottie Kight had been sweeping the pavement in front of her house early in the morning just prior to her death and there was considerable medical evidence of violence against her. Also, Lipscomb admitted in his statement to the police that she had struck him with a broom.

Subsequent to his arrest appellant confessed that he had had intercourse with each of the victims and that he had left the body of each of them at the location where it was found, but denied having raped them. He claimed that each of the victims consented to have intercourse with him and that he had strangled them unintentionally in the excitement of the sexual acts. The trial court was not bound to believe his claim that the intercourse was by consent of the victims; and, as we have said, we think the evidence was sufficient to warrant a finding in each case that it was accomplished by force and without the consent of the woman. Such a finding sustains the charge of rape. See *Hazel v. State,* 221 Md. 464, 157 A. 2d 922. The evidence also fully sustains the conclusion that the killing in each instance was committed in the perpetration of, or in an attempt to perpetrate, rape. Such a murder constitutes murder in the first degree. Code (1957), Art. 27, Sec. 410, which applies to murder committed in the perpetration of, or in an attempt to perpetrate rape, robbery, burglary or certain other crimes. *Stansbury v. State,* 218 Md. 255, 146 A. 2d 17 (murder during robbery); *Kier v. State,* 216 Md. 513, 140 A. 2d 896 (verdict of first degree murder upheld on either murder in attempt to rape or on wilful, de-

liberate and premeditated murder) ; *Shockley v. State,* 218 Md. 491, 148 A. 2d 371 (murder during robbery) ; *Thomas v. State,* 206 Md. 575, 581, 112 A. 2d 913 (murder in course of robbery). As to the charge of murder in the first degree, we may note that it would make no difference as to guilt under the above statute whether death occurred after the rape had been accomplished or in an attempt to perpetrate it.

In accordance with the views above stated we think that each of the convictions and the judgment under review must be affirmed.

*Convictions and judgment affirmed.*